UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GUTAMI INC., GUTAMI ENERGY LLC (f/k/a
CSG-GUTAMI, LLC), and GUTAMI SOLAR, LLC,

                Plaintiffs,

    v.

SCALE MICROGRID SOLUTIONS OPERATING, LLC
and SMS DEVFIN LLC,

                Defendants.

Civil Action No.:

---

## COMPLAINT

Plaintiffs Gutami Inc., Gutami Energy, LLC (f/k/a CSG-Gutami, LLC), and Gutami Solar, LLC (together, "Gutami"), by their attorneys, for their Complaint herein against Scale Microgrid Solutions Operating, LLC ("Scale") and SMS DevFin LLC ("SMS DevFin," and together, "Defendants"), allege as follows:

### PRELIMINARY STATEMENT

1.     This is a dispute between parties to a multi-contractual relationship for the sale of solar energy projects.

2.     Gutami is a global clean energy developer that develops, finances, and constructs renewable energy sources. It specializes in solar energy, battery storage, and hydrogen-based energy projects.

3.     Gutami and Scale entered into multiple agreements whereby Gutami agreed to develop and deliver community solar projects for acquisition by Scale.

4.     Upon information and belief, Scale, well after the fact, and following the sale of Scale from the private equity firm Warburg Pincus to EQT in February 2025, decided the

agreements it entered into were no longer good deals after the federal government rolled back many initiatives and incentives for clean energy projects. Instead of honoring the terms of the agreements, Scale has engaged in a pattern of duplicitous conduct designed to reduce its costs by frustrating the purposes of the agreements, preventing Gutami from taking certain actions needed to achieve those purposes, and inflicting financial harm on Gutami in an effort to essentially renegotiate the deals after the fact. Scale also has outright breached the agreements.

5.     Scale, for example, has obstructed the completion of project milestones by either refusing to complete, or by refusing to allow Gutami to complete, certain conditions precedent that are solely in Scale's control, and Scale then used this lack of completion—which it caused—as an excuse to withhold payments due to Gutami, which had otherwise reached (or in some cases had nonetheless reached) the milestones.

6.     Scale has also wrongly claims exclusivity over certain projects that Gutami developed and offered to Scale—even though Scale refused to take certain steps required for that exclusivity to apply and refused to purchase and build those projects (thereby frustrating the intent of the parties' agreement), and even though Scale instructed Gutami to look for alternative buyers for them, only to then accuse Gutami of breaching the parties' agreement when it solicited alternative buyers.

7.     Through these and other deliberate actions and inactions, Scale has hindered if not entirely prevented Gutami's ability to satisfy other obligations, such as repaying a loan to SMS DevFin (which is Scale's credit arm), and repeatedly frustrated the purpose of the parties' contractual agreements and relationship.

8.     This action seeks to recover payments Scale has wrongfully withheld from Gutami, including notice to proceed ("NTP") and commercial operating date ("COD") milestone

2

payments; to obtain declaratory relief confirming that Scale's asserted shortfalls, indemnities, liquidated damages, and setoff claims are unsupported; and seeks declarations regarding Scale's other breaches and violations, while also seeking to recover damages for Scale's obstruction of project progression, refusal to acquire qualifying projects, abandonment of the Maryland transaction, and assertion of exclusivity over projects it refused to purchase.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Gutami, Inc. (which is the sole member of the other two Gutami LLC Plaintiffs) is a citizen of Delaware and New York and, upon information and belief, none of the members of Scale or SMS DevFin are citizens of Delaware or New York. Accordingly, there is complete diversity between plaintiffs and defendants. Further, the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2). In MIPAs 1 and 2 (as defined below), Scale agreed to waive any objection to venue if brought in a state or federal court located in the state of New York. *See* MIPA 1 § 9.6; MIPA 2 § 9.6. Similarly, SMS DevFin agreed that any action arising from the Expansion Credit Agreement "shall be brought and tried exclusively in the federal or state courts located in the Borough of Manhattan, New York." Expansion Credit Agreement § 6.11.

## THE PARTIES

11.      Plaintiff Gutami, Inc. is a corporation organized under the laws of Delaware with a principal place of business located at 228 East 45th Street, Suite 9E, New York, NY 10017.

12.      Plaintiff Gutami Energy, LLC (formerly known as CSG-Gutami, LLC) is a Delaware limited liability company, whose sole member is Gutami, Inc.

3

13.     Plaintiff Gutami Solar, LLC is a Delaware limited liability company, whose sole member is Gutami, Inc.

14.     Defendant Scale is a limited liability company organized under the laws of Delaware. Upon information and belief, Scale's address is 51-53 S Broad Street, Ridgewood, New Jersey, and none of its members are citizens of New York or Delaware.

15.     Defendant SMS DevFin is a limited liability company organized under the laws of Delaware. Upon information and belief, SMS DevFin's address is also 51-53 S Broad Street, Ridgewood, New Jersey, and none of its members are citizens of New York or Delaware. Upon information and belief, its sole member is Scale, and it is wholly controlled by Scale.

### FACTS

16.     Gutami and Scale entered into two membership interest purchase agreements ("MIPAs") and various other agreements governing the sale of certain solar projects from Gutami and associated entities to Scale.

17.     In transactions such as these, it is typical for a company like Gutami to develop a clean energy generation project (including obtaining the necessary land acquisition and government approvals) in the name of a limited liability company (i.e., a "project company") it creates specifically for that project. Instead of actually selling individual aspects or assets of the project company and then trying to transfer the project approvals to the buyer, companies like Gutami instead sell the project company to the buyer. The sale of these project and project companies are commonly bundled to include multiple project companies at once. The sales are governed by a MIPA, with the project companies to be sold commonly listed in a schedule attached to the MIPA.

18.     On December 30, 2022, Gutami and Scale entered into "MIPA 1."

4

19.    Among other things, MIPA 1 governs the sale of membership interests in the "Three Sisters" solar projects (Three Sisters Solar Farm, Three Sisters Solar Farm 2, Three Sisters Solar Farm 3, and Three Sisters Solar Farm 4; collectively, the "Three Sisters Projects"), the "Payne" solar projects (Payne Solar Farm, Payne Solar Farm 2, Payne Solar Farm 3, and Payne Solar Farm 4; collectively, the "Payne Projects"), the Allan Bill solar project, and the Kerry Root solar project. A copy of MIPA 1 (and the Schedules to it) are attached as **Exhibit A**.

20.    On May 8, 2024, Gutami and Scale entered into "MIPA 2." MIPA 2 contained its own portfolio of solar projects, including the River Run Solar Farm and a series of other projects. A copy of MIPA 2 (and the Schedules to it) are attached as **Exhibit B**.

21.    Under both MIPAs, Gutami develops the projects and then sells the project companies to Scale. When Gutami satisfied certain conditions precedent ("CPs"), the MIPAs obligated Scale to make milestone payments.

22.    As part of these transactions, the MIPAs identify an amount of electricity a particular project is expected to generate, known as the "specific yield." Yield is generally measured in "kWh/kWp," where kWh stands for kilowatt-hours and kWp stands kilowatt-peak and represents the highest amount of electricity the solar panels could produce in optimal circumstances. For larger amounts of power, the yield can also be measured in megawatts ("MW") instead of kWh.

23.    Under both MIPAs, if the anticipated yield of a project drops below a certain amount, Gutami has the ability to present additional projects to Scale to make up for the shortfall. MIPA 1 § 6.4; MIPA 2 § 6.4.

24.    If Gutami cannot provide the agreed upon yield within a specified time, both MIPAs require Gutami to pay Scale for the shortfall. MIPA 1 § 6.4(d); MIPA 2 § 6.4(d).

25.    Both MIPA 1 and MIPA 2 contain obligations for the parties to cooperate and use commercially reasonable efforts to act in a way "to consummate the transactions contemplated by [the MIPAs] as promptly as practicable." MIPA 1 § 6.3; MIPA 2 § 6.3(a).

26.    Additionally, both MIPAs state that, "after the Closing, [Scale] agrees to use commercially reasonable efforts to achieve Commercial Operation, with respect to the Project associated such Project Company, as soon as reasonably possible." MIPA 1 § 6.3; MIPA 2 § 6.3(a).

27.    Both MIPAs also state that, "each of the Parties shall, and shall cause its Affiliates as appropriate, to use commercially reasonable efforts to take, or to cause to be taken, all action and to do, or to cause to be done, all things necessary, proper or advisable to complete, as promptly as practicable, the transactions contemplated herein…" MIPA 1 § 3.4; MIPA 2 § 3.4.

28.    MIPA 1 also contains an indemnification clause where Gutami agreed to indemnify Scale from certain "Losses" in connection with, among other things, inaccurate representations and warranties made by Gutami in MIPA 1 or Gutami's failure to perform under MIPA 1. *See* § 7.2.

29.    On January 15, 2024, Gutami, Scale, and SMS DevFin, and others entered into an "Expansion Credit Agreement" (which, as amended, amended and restated, supplemented or further modified, the "Credit Agreement"). The Expansion Credit Agreement was amended twice, first on May 8, 2024, in the Amended and Restated Expansion Credit Agreement ("Restated Expansion Credit Agreement") and again on March 31, 2025, in the "Agreement and First Amendment to Amended and Restated Expansion Credit Agreement" (the "First

Amendment to Credit Agreement"). These agreements are subject to a confidentiality provision. Instead of attaching them hereto, their terms are incorporated by reference.

30.     Under the Credit Agreement, SMS DevFin loaned money to Gutami to cover development expenses for projects covered by the MIPAs.

31.     Also on May 8, 2024, Gutami and Scale entered into an "Option Agreement." The Option Agreement granted Scale an exclusive right of first offer and refusal to purchase certain projects, subject to the Option Agreement's terms. This agreement is subject to a confidentiality provision. Instead of attaching it hereto, its terms are incorporated by reference.

32.     Together, the MIPAs, the Option Agreement, and the Credit Agreement form a unified transaction in which Scale's acquisition obligations and Gutami's development obligations are interdependent. The Option Agreement, for example, supplements the MIPAs — it does not operate as a standalone acquisition mechanism. The Option Agreement's project-level processes presuppose an active MIPA framework governing the acquisition of projects in the relevant jurisdiction; without such a MIPA, the Option Agreement's mechanisms have no operative commercial foundation and cannot function.

33.     On February 17, 2026, the parties also agreed to a "Partial Settlement Agreement." That agreement requires mutual agreement on setoff amounts. This agreement is subject to a confidentiality provision. Instead of attaching it hereto, its terms are incorporated by reference.

34.     Prior to the parties' execution of the Partial Settlement Agreement, Gutami timely delivered multiple projects well within the contractual timeframes. These projects reached commercial operation, thereby triggering Scale's obligation to make the corresponding COD milestone payments, including the Kanagy (4.843 MWp, COD April 28, 2025), Farmer

7

Brown (5.770 MWp, COD August 12, 2025), Barton (6.547 MWp, COD December 8, 2025), and Glenwood (7.189 MWp, COD December 31, 2025) projects.

35.    Scale failed to make these specific payments, leading to the Partial Settlement Agreement, under which Scale agreed to pay a certain amount and to provide an additional amount via a setoff that the parties were required to mutually agree to.

**The Payne Projects: Gutami Satisfies the NTP Requirements**

36.    On September 27, 2024, the parties executed the "Payne Closing Agreement." A copy of the Payne Closing Agreement is attached as **Exhibit C**.

37.    Together, MIPA 1 and the Payne Closing Agreement govern the sale of the Payne Projects, which consist of a portfolio of four co-located solar plant projects.

38.    The Payne Closing Agreement reaffirmed that MIPA 1 remained fully in force and that the NTP payment for the Payne Projects would be calculated as specified in the Payne-specific Schedule I. The Payne Closing Agreement did not amend or modify the NTP payment mechanics under MIPA 1.

39.    Under MIPA 1 § 2.3 and the Payne-specific Schedules, Scale must pay Gutami the NTP milestone once the CPs are satisfied. The Payne Closing Agreement confirmed that Gutami would deliver certain incremental items, after which the NTP payment would be due.

40.    One of the principal CPs for NTP was the issuance of building permits for the Payne Projects. On December 23, 2025, Chenango County issued four building permits (Permit Nos. 27152, 27153, 27154, 27155) authorizing construction of commercial solar systems at the Payne sites. These permits confirm compliance with the New York State Uniform Fire Prevention and Building Code and authorize construction to begin immediately.

41.     Scale never disputed the validity of these permits, never requested revisions, and never claimed any permit-related CP remained outstanding.

42.     By late December 2025, Gutami completed and satisfied all developer-side CPs.

43.     On January 28, 2026, landowner John Wayne Payne confirmed that the engineering, procurement, and construction ("EPC") contractor had already completed substantial physical construction activities, including trenching, conduit installation, concrete encasement, access road work, and perimeter fencing.

44.     These activities cannot occur before the NTP, as they require a valid building permit, which was issued on December 23, 2025, and Scale's instruction to proceed with construction.

45.     On information and belief, including based on the amount of work completed by January 28, 2026, construction began no later than January 15, 2026.

46.     Scale later admitted that NTP occurred "toward the end of February," but also claimed it was "not sure" when NTP occurred. Scale's admission that NTP occurred confirms that all conditions required for NTP had been satisfied and that the NTP payment obligation had matured before Scale attempted to recalculate the yield.

47.     For more than 18 months prior to the NTP, Scale consistently represented that the Payne yield was 1307 kWh/kWp. This figure appears in Scale's own internal models, communications, and in the Payne Schedule I.

48.     Gutami consistently stated that the Payne Projects' yield was higher— 1321 kWh/kWp. Gutami offered to compromise at 1314 kWh/kWp.

9

49.     At no point prior to Gutami satisfying the requirements for the NTP did Scale represent that the Payne Projects' yield was less than 1307 kWh/kWp or suggest that yield would be recalculated at the time of the NTP.

50.     Only after Gutami satisfied the requirements for the NTP did Scale attempt to retroactively change the Payne Projects' yield, claiming it was less than 1307 kWh/kWp.

**The Payne Projects: Scale Attempts to Change
<u>the NTP Requirements and Refuses to Pay Gutami</u>**

51.     On March 5, 2026, a Scale employee circulated new models showing a dramatically lower yield of 1200 kWh/kWp.

52.     This was not a "true up" under Schedule I. Schedule I expressly provides that yield is "True[d] up at final design", which occurs later at Commercial Operations Date ("COD"), not in the time between NTP (when a milestone payment is due to Gutami) and COD, and certainly not after NTP has already occurred.

53.     Scale's attempt to revise the yield after NTP was a unilateral effort to reduce the NTP payment, in violation of the MIPA 1, the Payne Closing Agreement, and the Payne Schedule I.

54.     On March 17, 2026, Gutami issued the formal NTP payment calculation based on the agreed yield and system size.

55.     On May 5, 2026, Gutami issued a formal demand for payment.

56.     On 7 May 2026, Scale refused to pay, asserting for the first time that (1) the yield must be recalculated at NTP; (2) the system size must be adjusted; and (3) Scale possessed setoff rights allowing it to deduct more than $3 million from the NTP payment, including monies allegedly owed under the Credit Agreement.

10

57. Scale's positions are meritless. The yield and system size were fixed in Schedule I; the Credit Agreement cannot amend the payment requirements under MIPA 1; and the Partial Settlement Agreement requires mutual agreement (which Gutami never provided) for any setoff.

58. Additionally, under the Payne Closing Agreement, Scale was obligated to pay a $1,000,000 Special Use Permit ("SUP") Payment within ten business days of the SUP extension being granted.

59. Gutami delivered the SUP extension.

60. Scale refused to pay the SUP Payment, in direct breach of Section 5 of the Payne Closing Agreement and Section 3.3 of MIPA 1.

61. Instead, Scale "loaned" the unpaid SUP Payment to Gutami through SMS DevFin as an additional loan under the Credit Agreement (essentially forcing Gutami under protest to accept the funds as such, as Gutami needed them as a result of Scale's breaches), increasing the loan balance and interest burden.

**The Payne Projects: Scale's Faulty Request for Indemnification**

62. Scale claims that Gutami owes it $6,484,826 in alleged "Brownfield Indemnity" relating to the Payne Projects.

63. Specifically, Scale claims that Gutami purportedly misrepresented that the Payne Projects qualified under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") as Brownfields and are, therefore, eligible for the federal Brownfield investment tax credit ("ITC") adder (*i.e.*, an additional credit, bonus, or enhancement applied to an existing incentive).

11

64.    Gutami never made any such representation that the Payne Projects qualified for the Brownfield ITC adder.

65.    Neither MIPA 1, the Payne Closing Agreement, nor any disclosure schedule contains any such representation that the Payne Projects qualified for the Brownfield ITC or that Gutami was responsible for "indemnifying" Scale if the Payne Projects did not qualify for the Brownfield ITC.

66.    In fact, the federal Brownfield ITC adder did not exist at the time the parties executed MIPA 1 or the Payne Closing Agreement. Gutami could not have represented eligibility for a federal incentive that did not exist at the time of contracting. Scale's indemnity theory improperly attempts to impose retroactive obligations on Gutami based on post-closing regulatory developments.

67.    In its claim for indemnification, Scale relies upon a spreadsheet called "NY Portfolio Key Data Template Updated – Baron Solo Park Version." However, the spreadsheet contains no statement that any of the Payne Projects is a "Brownfield Project."

68.    The only references to the term "Brownfield" are temporary working names ("Brownfield Array 1–4"), which were used solely because the sites were located on **state-designated** brownfields and eligible for the NYSERDA brownfield incentive which was subsequently awarded—not federal ITC brownfields. And these descriptive labels were removed before the execution of MIPA 1, which includes an integration clause, and they were not included in any disclosure schedule, representation or warranty, or any closing document.

69.    The Payne Projects were never referred to by Gutami, Scale or any document as "Brownfield Projects," much less a representation or warranty that the Payne Projects were eligible for Brownfield ITCs.

12

70.    MIPA 1 § 4.19(p) requires that a Brownfield Project be "identified by Seller" as such; no such identification occurred.

71.    The Payne Closing Agreement, which also includes an integration clause, contains no reference to Brownfield Projects, Brownfield ITC eligibility, or any tax-related representation or warranty.

72.    Scale's allegation under MIPA 1 § 4.19(p) is based solely on temporary name-placeholders that appeared on a technical tracker attached to Schedule I in the MIPA 1 closing packet. These placeholders were not negotiated terms, were never incorporated into any representation, warranty, or condition precedent, and had no contractual force. They cannot create an obligation that does not exist anywhere in the executed agreements.

73.    Despite demand that Scale identify any "Loss" under MIPA 1 § 7.2(a), Scale has produced none.

74.    During negotiations, Scale made clear that any bonus ITC (energy community, brownfield, LMI, etc.) was an "investor-only incentive" and that Gutami would receive no share of any bonus ITC upside. Scale also stated that bonus ITC eligibility was uncertain and therefore refused to include any adjuster mechanism (in the sale price) for potential bonus ITC benefits. Gutami ultimately agreed, and the final transaction documents reflect this position. No ITC adjuster appears in any Schedule I email trail or negotiated term sheet; no conditions precedent in Schedule II reference bonus ITC qualification, opinion letters, or applications; no disclosure schedule contains any representation or warranty relating to bonus ITC eligibility; and no email or document shows Gutami undertaking any action to secure bonus ITC qualification, because Gutami had no commercial incentive to do so.

75.    The Payne 1-4 purchase price and project economics were, therefore, calculated solely on the basis of a 30% ITC, with no bonus ITC assumed or included. What Scale now describes as a "loss" is simply the absence of an additional 10% bonus ITC that Scale hoped to capture for itself. Because Scale elected to retain 100% of any bonus ITC upside, and Gutami made no representation regarding bonus ITC eligibility, Scale cannot now shift the alleged downside to Gutami.

76.    Writings from negotiations of MIPA 2 further prove that Scale never interpreted MIPA 1 § 4.19(p) to serve as a warranty or guarantee that a project qualified for a Brownfield ITC adder, or that Scale intended to shift the tax risk of the Brownfield ITC adder to Gutami.

77.    Notably, MIPA 2 § 4.19(q), which was negotiated later, uses the same language as MIPA 1 § 4.19(q).

78.    Written evidence confirms that, during the negotiations for the MIPA 2 Expansion Agreement, Scale stated that ITC and Bonus ITC incentives were **Scale's risk** and Scale's upside, and that Gutami would not receive any adjustment, compensation, or protection related to ITC or tax outcomes. Scale assumed full responsibility for ITC/tax outcomes (positive or negative). In particular, in an Excel spreadsheet named "100MW NY New Deal vTW Comments", circulated by Scale, Scale wrote: "we take on ITC and tax risk. We also removed yield. No ITC/tax adjustments." A copy of this spreadsheet is attached as **Exhibit D**.

79.    If Scale genuinely believed MIPA 1 § 4.19(q) created a warranty, guarantee, or risk allocation to Gutami, then Scale would not have simultaneously written in negotiations for MIPA 2—which uses identical language for  4.19(q)—"we take on ITC and tax risk… No ITC/tax adjustments."

14

80.     Scale's interpretation of § 4.19(q) was consistent across both agreements: Scale understood and accepted ITC/tax risk;  Scale did not expect Gutami to bear ITC/tax downside; Scale did not interpret § 4.19(q) as a warranty or guarantee; and Scale did not negotiate any ITC/tax indemnity.

81.     The Payne Closing Agreements are dated September 29, 2024. Writings between Scale and Gutami (and/or their counsel) further confirm that Scale was well aware of the environmental conditions and status of the Payne 1-4 site, including the site's ongoing monitoring, contamination above cleanup levels, and continuing regulatory obligations.

82.     Scale's environmental counsel identified in writing these environmental risks at the Payne 1-4 site, including contamination above cleanup levels and ongoing New York State Department of Environmental Conservation ("DEC") obligations. Scale had discussed these risks internally, including potential cost exposure. Scale proposed contractual protection, specifically indemnification **from the landowner** for these conditions. And Gutami responded to Scale's proposal by then proposing lease language that explicitly disclosed the DEC Class 4 status and allocated responsibility to the landowner. A copy of this correspondence is attached as **Exhibit E**.

83.     Scale's knowledge of these environmental conditions at the Payne 1-4 site confirm that its eligibility under the CERCLA Brownfield program was, at minimum, highly uncertain, as the site had active environmental obligations, and its regulatory status was materially relevant to any eligibility for bonus Brownfield ITC adders.

84.     The environmental conditions described in these writings are inconsistent with straightforward qualification under the CERCLA Brownfield program and demonstrate that eligibility for the Brownfield ITC adder was uncertain at the time of closing.

85.    Scale was aware of these risks and cannot now argue that it was unaware of the environmental condition or that Gutami concealed relevant information.

**The Three Sisters Projects: Gutami Completes All CPs under Its Control**

86.    On June 21, 2024, the parties executed the Three Sisters Closing Agreement. A copy of the Three Sisters Closing Agreement is attached as **Exhibit F**.

87.    Together, MIPA 1 and the Three Sisters Closing Agreement govern the sale of the Three Sisters Projects.

88.    The Three Sisters Closing Agreement reaffirmed that MIPA 1 remained fully in force and that the NTP payment for the Three Sisters Projects would be calculated using the Three Sisters–specific Schedule I.

89.    After the membership interests of the project companies were transferred from Gutami to Scale for the Three Sisters Projects on June 21, 2024, Scale became the sole owner of the Three Sisters project companies, the project land, and the developer of record with the electrical company NYSEG, the Town of Chemung, and all other authorities.

90.    Although certain CPs were nominally assigned to Gutami in the Closing Agreement, only Scale—as the owner of the projects and its real property and other rights—had the legal and practical ability to complete them, including applying for and obtaining building permits; executing easements and rights of way; posting the decommissioning bond; signing landowner-side documents; and submitting New York State Energy Research and Development Authority ("NYSERDA") incentive applications such as the Statewide Solar for All ("S-SFA") adder.

**The Three Sisters Projects: Scale Refuses to Complete**
**Three Sisters Projects CPs or Permit Gutami to Complete Them**

91.    Scale has engaged in conduct specifically designed to avoid the completion of the CPs for the Three Sisters Projects—and to frustrate any attempt of Gutami to complete the remaining CPs within Scale's control—in order to avoid its payment obligations.

92.    Gutami repeatedly requested that Scale either complete these CPs itself or grant Gutami a power of attorney so Gutami could complete them on Scale's behalf.

93.    On March 19, 2026, Gutami's counsel asked Scale to confirm whether it would provide the necessary authorizations or powers of attorney, or whether it intended to waive the CPs.

94.    On March 20, 2026, at Scale's request, Gutami provided a draft power of attorney. Scale refused to sign it.

95.    On April 4, 2026, Gutami's counsel sent a letter documenting that Scale refused to provide a power of attorney, refused to authorize Gutami to complete the CPs, and refused to complete the CPs itself.

96.    Since that letter, Scale has continued to prevent the completion of the CPs. By doing so, Scale has rendered performance impossible.

97.    Additionally, Scale's obstructions have prevented Gutami from reaching achievable incentives under the agreements.

98.    Additionally, Scale's obstructions have frustrated the purpose of the parties' agreements.

99.    For example, Schedule I includes an Incentives Adjustment mechanism that applies to NYSERDA incentives, including the S-SFA adder. Scale has refused to apply for the S-SFA adder, despite having exclusive control as developer of record.

17

**The Three Sisters Projects: Interconnection Problems**

100.    On May 17, 2024, Gutami requested from NYSEG the invoice for all outstanding interconnection costs for integrating the Three Sisters solar plants into the electrical grid with the intent to pay the invoice in full immediately.

101.    On May 22, 2024, NYSEG issued the cost-share invoices. As noted above, Scale became owner of the project companies on June 21, 2024. The invoices required full payment by August 26, 2024.

102.    Scale, as owner, did not make the cost-share payment to NYSEG for grid interconnection, which is necessary for the projects to proceed.

103.    On August 9, 2024, Scale asked NYSEG for an extension to January 1, 2025, to make the cost-share payment. NYSEG granted the extension on or around August 12-13, 2024.

104.    Gutami first became aware of Scale's extension request when a NYSEG employee copied Gutami personnel to the email chain between NYSEG and Scale. Despite protests from Gutami and an apology by Scale, NYSEG had already granted the extension and could not reverse its decision.

105.    However, grid interconnection required more than making a cost-share payment to NYSEG. Such an interconnection also requires an approval by the Coordinated Electric System Interconnection Reviews ("CESIRs"), in which a utility company (like NYSEG) must demonstrate that it has completed the needed studies for interconnection.

106.    On August 26, 2024, CESIRs for the Three Sisters Projects lapsed under New York's Public Service Commission rules.

107.    When Scale missed the August 26, 2024 CESIR payment deadline, the CESIRs that were valid at the time of the membership-interest transfer for the project had lapsed.

18

As a result, NYSEG was required to perform entirely new CESIR studies. The restudies did not simply update the prior estimate; they introduced a fundamentally different and significantly more expensive interconnection design. NYSEG completed the needed re-studies in November 2024 and delivered the results in December 2024. Because of the re-studies, the price for the interconnection increased from approximately $8.4 million to $20,268,343. The re-studies also fundamentally altered the scope of the interconnection work required. Where the original CESIRs had approved a specific set of upgrades and configurations, the new CESIRs required additional infrastructure improvements and system modifications that had not been part of the original approval, including adding a new control room, expanding the substation, and upgrading protection, communication, and SCADA systems. This expanded scope—caused entirely by Scale's failure to timely make the cost-share payment—resulted in a 1.5-year delay to the project and exposed Gutami and the Three Sisters Projects to substantially greater costs and risk.  Had Scale not allowed the CESIR to lapse, NYSEG would not have been able to impose such an expanded scope of work.

108.    On the same day that Scale requested the extension from NYSEG, it told NYSEG it needed "more time to confirm there are no more issues with the town . . . plus get the fire department signoff."

109.    Scale's stated justification for delay was knowingly inaccurate. By August 13, 2024, all four Special Use Permits for the Three Sisters solar plants had been issued (on or about November 28, 2023); all four Host Community Benefit Agreements had been executed (on or about July 10, 2024); and the Fire Department Approval Letter had been issued (on or about August 9, 2024).

19

110.    While Scale has repeatedly claimed that NYSEG initiated the re-runs/re-studies, the original CESIRs lapsed only because Scale missed the new deadline to pay the cost-share invoices.

**The Three Sisters Projects: Scale Refuses to Pay and Offers Unfounded Excuses**

111.    On April 4, 2026, Gutami demanded payment of the Three Sisters NTP in the amount of $4,716,444.83.

112.    Scale refused to pay.

113.    In doing so, Scale made several assertions for the first time, including that the NTP Payment was $0.00, that the increased interconnection cost from the CESIR restudies retroactively reduced the purchase price; that certain CPs were incomplete (the ones only Scale could complete while also preventing Gutami from completing them on Scale's behalf); that the projects' energy yield must be recalculated; that the system size must be fixed at 1.3 DC:AC (to boost energy production); and the S-SFA adder does not apply to the projects (even though Scale refused to apply for it).

114.    None of these positions appear in MIPA 1, the Three Sisters Closing Agreement, or Schedule I. They are post-hoc inventions designed to avoid payment.

115.    Scale's refusal to apply for the S-SFA adder was not inadvertent. Obtaining the adder would have increased the purchase price under Schedule I, giving Scale a direct financial incentive to block it.

116.    Under the prevention doctrine, Scale cannot refuse to take a step solely within its control, benefit from that refusal by reducing the purchase price, and then cite the resulting non-occurrence as a basis to withhold payment. Accordingly, the S-SFA adder must be treated as obtained for purposes of calculating the Three Sisters NTP payment, or Scale is liable for the corresponding lost value.

20

117.    Scale also had no basis to retroactively reduce the purchase price based on the increased interconnection cost from the CESIR restudies. Under Schedule I of MIPA 1, interconnection cost adjusters apply only to a valid CESIR at time of membership transfer, not one that lapsed post-transfer (beyond Gutami's control and) due to Scale's sole conduct. Scale cannot cause the CESIRs to lapse and then use the resulting cost increase to reduce the purchase price after-the-fact or avoid the NTP payment.

118.    Had Scale made the required CESIR payments by the August 26, 2024 deadline, NYSEG would not have been able to impose such an extensive additional scope or work and the costs associated with it.

**Scale Created a Shortfall of Delivered Energy by Frustrating or Rejecting Multiple Other Projects including the Bill, Kerry Root, Maryland, and River Run Projects.**

119.    MIPA 1 required Gutami to deliver 100 megawatts ("MW") of so-called Qualifying Projects, and obligated Scale to cooperate, evaluate, and acquire qualifying projects submitted by Gutami.

120.    Gutami identified, developed, and advanced multiple Qualifying Projects, including the Busti project (with 6.5 MWp), a New York portfolio offered by a third party developer (with a combined 30 MWp), and the Bill Solar and Kerry Root Solar Farms (with an approximately 15 MWp combined), that met the criteria for acceptance under MIPA 1.

121.    But Scale rejected these qualifying projects without basis, failed to respond to submitted projects, and took over and stalled projects that were already progressing toward the NTP.

122.    Scale conducted full legal, technical, and commercial diligence on the Busti project. After completing diligence, Scale declined to proceed but did not identify any contractual deficiency under MIPA 1 or the Option Agreement.

21

123.    Instead, following Scale's initial rejection of the Busti project, Scale separately warned Gutami "keep well away from" the Busti project (or words to that effect), implying the existence of an undisclosed issue unrelated to contractual criteria.

124.    In reality, Scale's refusal to proceed with the Busti project or any of the others offered to it by Gutami served as further evidence that Scale was not rejecting Busti (or any other project) on any project-specific basis but rather sought to withdraw from community solar projects which became less valuable (and more costly) due to regulatory changes by the federal government after the parties had negotiated and agreed to the terms of the MIPAs.

125.    On August 21, 2025, Gutami submitted a 30 MWp New York portfolio to Scale after being offered to Gutami by a third-party developer. On September 26, 2025, Gutami sent a formal request for confirmation, asking Scale to confirm acceptance or rejection by October 7, 2025. Scale did not respond for approximately six weeks. On October 2, 2025, Scale representative Max Braun replied with basic preliminary questions that could have been raised immediately upon receipt of the August materials. By the time Scale finally engaged, the portfolio had entered exclusivity with another investor and was no longer available. The loss of the 30 MWp portfolio was caused solely by Scale's delay and failure to respond within a commercially reasonable timeframe. Scale's failure to provide a timely acceptance or rejection was itself commercially unreasonable and prevented Gutami from preserving the opportunity.

126.    Gutami developed the Bill Solar Farm and Kerry Root Solar Farm and retained 100% ownership of the projects' special purpose vehicles ("SPVs") and all site control agreements. Scale was listed as Developer of Record after a joint decision to place both projects into the NYSEG Capital Queue due to uneconomic interconnection costs.

22

127.    Special Use Permits for the Bill Solar Farm and Kerry Root Solar Farm were approved by the Town of Toga on April 9, 2024. Eventually, the two solar farms would need multiple other permits. However, NYSEG required upgrades to its nearby substation in order for the projects to proceed, and these upgrades were not expected until 2028. Consequently, any attempt to fully permit the projects now would result in permits expiring long before construction is viable.

128.    Gutami explained to Scale that advancing permitting prematurely for the Bill Solar Farm and Kerry Root Solar Farm would create wasted cost and stale approvals and proposed two options: (1) Scale accepts the combined approximately 15 MWp of the Bill and Kerry Root Solar Farms toward the alleged MIPA 1 shortfall and takes full ownership of the project companies, or (2) Scale steps out and returns Developer of Record status to Gutami so Gutami can reposition the projects (*i.e.*, sell them to someone else).

129.    Scale rejected Option 1, stating that the projects "will not reduce the MIPA 1 shortfall payment," and insisted that Gutami must advance the projects along a "normal" development path despite the 2028 interconnection horizon.

130.    Gutami explained why Scale's position was commercially incoherent and requested that Scale elect either Option 1 or Option 2, but Scale never replied.

131.    Similarly, MIPA 2 required Gutami to deliver 100 megawatts ("MW") of Qualifying Projects, and also obligated Scale to cooperate, evaluate, and acquire qualifying projects submitted by Gutami.

132.    Gutami offered Scale a series of projects under development in Maryland that the parties commonly referred to as the "Maryland Portfolio." The Maryland portfolio is a collection of 18 community solar projects totaling more than 40 MWp in Maryland, that Gutami

23

to Scale in July 2024. The parties engaged in approximately eleven months of negotiations, which culminated in a fully negotiated and ready-to-sign MIPA with an effective date of June 13, 2025. A copy of this unexecuted but negotiated MIPA 3 is attached as **Exhibit G**.

133.    On July 3, 2025, Scale informed Gutami at a board meeting that it would not proceed with the acquisition and subsequently directed Gutami to alternative buyers.

134.    Scale's last-minute withdrawal from the Maryland MIPA and process eliminated more than 40 MWp of Qualifying Projects from the MIPA 2 pipeline. These MWs were fully deliverable but were prevented solely by Scale's decision to abandon the transaction.

135.    Scale also declined to pursue another Qualifying Project from Gutami: the River Run project, which would have provided approximately 4.7 MWp. Scale refused to support required interconnection-related financing and repeatedly expressed a lack of commercial interest in this project.

136.    Gutami satisfied every condition Scale claimed was required for acquisition of the River Run project, including clean title, New York Department of Environmental Conservation ("DEC") site approval, an executed interconnection agreement, confirmed NYSERDA incentives, and all major municipal approvals, engineering, and permitting.

137.    Despite receiving a fully de-risked, NTP ready project, Scale made no proposal, refused to progress the project, and declined to support the final interconnection payment, preventing delivery of the 4.7 MWp associated with River Run.

138.    And despite later being provided, once again, with full access to River Run data and information, Scale did not review any of the materials or ask any questions, and did

not engage in any way with the River Run project, confirming Scale had no intention of progressing River Run under MIPA 2.

139.    In addition to rejecting River Run under MIPA 2, Scale simultaneously asserted that the project remained subject to exclusivity under the Option Agreement, that Gutami would owe a 37.5% Turned Down Payment if the project were sold to another developer, and that River Run must be re-offered to Scale before any third-party transaction could occur. On the one hand, Scale expressly rejected the project and refused to fund required interconnection payments, and on the other hand, it asserted ongoing exclusivity rights designed to prevent Gutami from preserving or monetizing the project elsewhere. This conduct had the practical effect of rendering River Run commercially non-viable. Scale appeared determined not to proceed with the project itself while simultaneously ensuring that Gutami could not advance, safe-harbor, or sell the project to mitigate its losses. As a result, Gutami now faces a July 3, 2026 safe-harbor deadline that places both the project and approximately $1 million in sunk development costs at risk solely because of Scale's contradictory assertions and refusal to act.

140.    Scale more recently has claimed that Gutami is responsible for a shortfall in Qualifying Projects and kWh/kWp worth $3,206,880 under MIPA 1 and $928,112.80 under MIPA 2. Scale has never issued a formal shortfall notice under MIPA 1, nor has it provided any calculation methodology or contractual basis for this figure.

141.    Additionally, Scale has refused to progress or acquire other Qualifying Projects that Gutami has offered to it and that could have been used to meet the purported shortfall. These actions and inactions include, among other things, refusing to issue powers of attorney, execute CP documents, approve easements, pay deposits, respond to project submissions, or provide acceptance or rejection within defined timeframes.

25

**Scale Claims Liquidated Damages under the Option Agreement**

142.    The Option Agreement provides for a limited period of exclusivity for Scale to purchase certain projects.

143.    Scale claims that Gutami's Maryland portfolio and the River Run project—both of which Scale declined to purchase and build—were included in the Option Agreement, and that Gutami violated the Option Agreement's exclusivity requirements by offering these projects to others.

144.    The Option Agreement does not apply to either set of these projects.

145.    For the Maryland portfolio, none of the projects was ever submitted under the Option Agreement process. No project companies were formed, no agreements were assigned, no Proposed Project Summaries were delivered, no non-binding acceptances were issued, and no right of first offer or right of first refusal periods were triggered.

146.    The Option Agreement's pipeline mechanism was never activated for the Maryland portfolio, and Scale's abandonment of the umbrella MIPA for these projects ended any exclusivity that might otherwise have applied.

147.    The Option Agreement supplements the MIPAs; it does not operate as a standalone acquisition mechanism. The Option Agreement's project-by-project processes—the Proposed Project Summary, the non-binding acceptance, the ROFO Period, and the Project Acceptance Notice—presuppose a functioning commercial framework established by a MIPA that governs the acquisition of projects in the relevant jurisdiction, including the purchase price mechanics, closing conditions, representations, warranties, and transaction terms. Without a Maryland MIPA providing that commercial foundation, the Option Agreement's project-level mechanisms have no operative foundation and cannot function for Maryland projects.

26

148.    By abandoning the Maryland MIPA on July 3, 2025, Scale rejected the Maryland portfolio at the commercial level before any project-level Option Agreement process could be triggered. Scale's commercial rejection of the Maryland MIPA itself constitutes an effective rejection of the Maryland portfolio under the Option Agreement. Having refused to execute the MIPA that was the prerequisite for the Option Agreement to govern Maryland projects at the project level, Scale cannot now invoke the Option Agreement's exclusivity provisions—which presuppose the very commercial framework Scale refused to create—to claim that Gutami violated those provisions by seeking alternative buyers.

149.    Scale may argue that the First Amendment to the Amended and Restated Expansion Credit Agreement designated Maryland as an "approved jurisdiction" under the Option Agreement, expanding its geographic scope to include Maryland. Even if this is so, it does not alter the analysis. The First Amendment expanded the Option Agreement's territorial coverage; it did not supply the MIPA framework that is a structural prerequisite for the Option Agreement's project-level mechanisms to operate. And critically, Scale's refusal to execute the Maryland MIPA postdated the First Amendment—Scale's own subsequent commercial-level rejection rendered inoperable the mechanisms the First Amendment had extended to Maryland.

150.    The River Run project is expressly included in MIPA 2 (Ex. B), which contains its own economics, milestones, obligations, and remedies. Scale confirmed in writing that River Run would be evaluated under MIPA 2.

151.    MIPA 2 does not place River Run into the Option Agreement pipeline, and nothing in MIPA 2 revives or imposes Option Agreement exclusivity on River Run.

152.    Even if the Maryland portfolio were covered by the Option Agreement, after Scale declined the Maryland portfolio, Scale's Vice President, Tom Wheeler, directed

27

Gutami to eight alternative buyers, including Altus Power, Pivot Energy, Standard Solar, Nautilus Energy, Catalyze, Clean Capital, Luminace, and True Green Capital. A copy of a WhatsApp message from a Scale representative to Gutami's CEO, asking him to contact these investors, is attached as **Exhibit H**.

153.    Gutami relied on Scale's direction and proceeded accordingly. Even if the Maryland portfolio were covered by the Option Agreement, Scale's direction to market the Maryland portfolio to third parties triggered the Option Agreement mechanism providing for Scale's notice that it no longer intends to pursue the proposed acquisition of the relevant projects, thereby terminating any continuing exclusivity.

154.    As to the River Run project, no proposed project summary was submitted, no non-binding acceptance was issued, and no right of first offer or right of first refusal process was triggered.

155.    The conditions precedent to any exclusivity under the Option Agreement were never met, and the Option Agreement's mechanisms were never activated for River Run.

156.    On August 13, 2025, Scale declined to fund the required 25% interconnection deposit for River Run, stating that it was "respectfully declining to lend" and that the project was "not at (or near) NTP."

157.    Gutami was forced to subsequently self-fund the interconnection deposit to preserve the project.

158.    Gutami later satisfied every condition Scale identified, including clean title, DEC approval, an executed interconnection agreement, and confirmed NYSERDA incentives. Despite this, Scale expressed no interest in River Run and made no proposal.

**The Credit Agreement**

159.    The Credit Agreement is a development financing instrument tied to Scale's acquisition obligations under the MIPAs and the Option Agreement. Under the Credit Agreement, Scale (via SMS DevFin) advanced funds to Gutami—funds that Gutami utilized—solely for Approved Projects that Scale had the right to acquire.

160.    The Option Agreement states that it "constitutes a Loan Document and a Transaction Document (as defined in each MIPA)."

161.    As noted above, Scale refused to pay a $1,000,000 SUP Payment due to Gutami, in breach of MIPA 1 and the Payne Closing Agreement. Consequently, Gutami was forced to accept funds as an additional loan under the Credit Agreement to cover this shortfall.

162.    Repayment under the Credit Agreement depends on project progression—NTP, COD, sale, or termination of project agreements.

163.    Scale has communicated that it believes that repayment by Gutami was due on May 8, 2026.

164.    Scale asserts that the amount of principal and interest due under the Credit Agreement is $3,501,704.23. However, after setting off $774,153 of the debt against the Payne NTP payment and $1,400,000 of the debt against the credit that was agreed to in a February settlement agreement between the parties (*i.e.*, the Partial Settlement Agreement), Scale asserted that Gutami owed a net amount of $1,327,551.23.

165.    Gutami never agreed to either setoff.

166.    Moreover, Gutami has disputed Scale's claim that Gutami is subject to accelerated payment under the Credit Agreement, given Scale's conduct. Gutami has not denied liability under the Credit Agreement, nor has it repudiated its obligations under the agreements between the parties.

29

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Breach of MIPA 1 against Scale – Payne NTP Non-Payment)

167.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

168.    MIPA 1 and the Payne Closing Agreement are enforceable contracts.

169.    Gutami performed under both agreements by meeting the CPs and developing the Payne Projects to meet the agreed upon yield.

170.    Scale materially breached MIPA 1 § 2.3(a) and the Payne Closing Agreement by refusing to pay the NTP milestone.

171.    To the extent Scale claims Gutami failed to meet any obligation under the MIPA (it did not), any such failure would have been the result of Scale's breach of its cooperation obligations under MIPA 1 §§ 6.3, 3.4.

172.    Gutami has been damaged by Scale's breach(es).

173.    By reason of the foregoing, Gutami is entitled to a judgment against Scale for $7,195,610.67, plus interest, costs, disbursements, and attorney's fees.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Breach of MIPA 1 against Scale – Three Sisters NTP Non-Payment)

174.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

175.    MIPA 1 and the Three Sisters Closing Agreement are enforceable contracts.

176.    Under MIPA 1 § 2.3(a) and Schedule II, Scale must pay Gutami the NTP milestone once the CPs are satisfied.

30

177. Gutami performed under both agreements by meeting all CPs under its control and all of its contractual obligations under MIPA 1 and the Three Sisters Closing Agreement.

178. Scale materially breached the MIPA 1 § 2.3(a) and the Three Sisters Closing Agreement by refusing to pay the NTP milestone.

179. Scale's excuses for non-payment are contradicted by MIPA 1, the Three Sisters Closing Agreement, or Schedule I.

180. Scale's refusal to either complete the CPs solely within its control or grant Gutami a power of attorney to do so on Scale's behalf, including applying for the S-SFA adder, violates Scale's agreement in MIPA 1 §§ 6.3, 3.4 to cooperate with Gutami and to take all necessary steps to consummate the Three Sisters Project.

181. To the extent Scale's refusal (to either complete the CPs solely within its control or grant Gutami a power of attorney to do so on Scale's behalf, including applying for the S-SFA adder) rendered Gutami unable to meet a contractual obligation required to trigger NTP payment, then Scale's conduct prevented Gutami from doing so and violates the prevention doctrine, which prevents a party from relying on the non-occurrence of a condition precedent to escape liability if the party itself prevented the condition precedent from occurring.

182. Schedule I of the MIPA prohibits Scale's attempt to avoid the NTP payment or reduce the purchase because of increased interconnection costs. Under Schedule I, such adjustments apply only to a valid CESIR, not one that lapsed due to Scale's own conduct.

183. The CESIR re-study caused the interconnection cost to increase from approximately $8.4 million to $20.27 million — an increase of approximately $11.87 million.

184. Gutami has been damaged by Scale's breach(es).

31

185.    Gutami is entitled to a judgment against Scale for at least $4,716,444.83, plus interest, costs, disbursements, and attorney's fees.

### AS AND FOR THE THIRD CAUSE OF ACTION

**(Breach of the Payne Closing Agreement and MIPA 1 against Scale – Failure to Make SUP Payment)**

186.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

187.    Under the Payne Closing Agreement, Scale was obligated to pay a $1,000,000 Special Use Permit ("SUP") Payment within ten business days of the SUP extension being granted.

188.    Gutami delivered the SUP extension.

189.    Scale refused to pay the SUP Payment, in direct breach of Section 5 of the Payne Closing Agreement and Section 3.3 of MIPA 1.

190.    Instead, Defendants "loaned" the unpaid SUP Payment to Gutami as an additional loan under the Credit Agreement, increasing Gutami's loan balance (by $1,000,000) and interest burden.

191.    No provision of the Payne Closing Agreement, MIPA 1, or the Credit Agreement authorized Scale to substitute a loan for a direct payment obligation, making the conversion itself an independent breach rather than simply a failure to pay.

192.    To the extent Scale's refusal to make the SUP Payment rendered Gutami unable to meet a contractual obligation, then Scale's conduct prevented Gutami from doing so and violates the prevention doctrine, which prevents a party from relying on the non-occurrence of a condition precedent to escape liability if the party itself prevented the condition precedent from occurring.

32

193.    Gutami has been damaged by Scale's breach(es).

194.    Gutami is entitled to a judgment against Scale for at least $1,000,000, plus Gutami's interest burden for the "loaned" amount, or (alternatively) a judgment recharacterizing the $1M Credit Agreement loan as an outright payment already owed (effectively reducing the Credit Agreement balance by $1M) and awarding the interest that has accrued on that $1M balance from the date it should have been paid as a direct SUP payment, costs, disbursements, and attorney's fees.

## AS AND FOR THE FOURTH CAUSE OF ACTION

### (Breach of the Partial Settlement Agreement against Scale – Failure to Make COD Purchase Price Payments Due)

195.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

196.    The Partial Settlement Agreement requires Scale to pay Gutami an Outstanding Purchase Price Payment (previously due as COD milestone payments for the Kanagy, Farmer Brown, Barton, and Glenwood projects).

197.    Under the Partial Settlement Agreement, Scale agreed to, among other thing, pay Gutami $1,400,000, which "shall be set off by [Scale] against amounts owed by the Gutami" to Scale. The provision goes on to state that the "specific amounts to be used for the set off… will be agreed upon between the Parties in future negotiations."

198.    The parties never agreed to a setoff amount or when such setoff would occur.

199.    Instead, Scale unilaterally determined that it would setoff the full $1,400,000 due to Gutami from the NTP milestone payment due to Gutami for the Payne

projects under MIPA 1 § 2.3(a) and the Payne Closing Agreement. In doing so, Scale breached the Partial Settlement Agreement.

200.    Scale cannot use fabricated claims to withhold a contractually owed payment.

201.    Scale has no contractual or legal basis to unilaterally determine and apply setoff amounts absent the mutual agreement expressly required by the Partial Settlement Agreement.

202.    Gutami is entitled to a judgment against Scale for at least $1,400,000, plus interest, costs, disbursements, and attorney's fees.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Declaratory Judgment against Scale – No Indemnity Owed)

203.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

204.    There is a substantial controversy between Gutami and Scale as Scale claims and Gutami denies that Gutami owes Scale $6,484,826 for alleged "Brownfield Indemnity" relating to the Payne Projects.

205.    This claim for indemnification arises under section 7.2 of MIPA 1.

206.    Both parties have adverse legal interests in determining whether Gutami must indemnify Scale.

207.    As Scale has used the purported indemnification as a reason to withhold past-due payments under other agreements, the controversy is real and immediate and warrants declaratory judgment.

208.    Scale's claim for indemnification is unfounded.

34

209.    Gutami made no representation regarding the Payne Project's eligibility for Brownfield ITC, no indemnity trigger exists, no Loss under MIPA 1 § 7.2 has occurred, and the claim is based on assumptions and regulatory developments that arose long after closing. Further, the Payne Closing Agreement contains a full integration clause that supersedes all prior negotiations and informal naming conventions. And under New York's parol evidence rule, temporary working names used before execution of the Payne Closing Agreement cannot create contractual representations that do not appear in the executed agreement.

210.    Scale, knowing the environmental conditions for Payne 1-4, sought indemnification protection from the *landowner*, not from Gutami.

211.    By reason of the foregoing, Gutami is entitled to a declaratory judgment that Gutami is not obligated to indemnify Scale $6,484,826 or any other amount in connection with the Payne Projects for any reason under MIPA 1, the Payne Closing Agreement, or any other agreement.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### (Declaratory Judgment against Defendants – No Payments Owed Under Credit Agreement)

212.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

213.    Scale has asserted that, after "offsets," Gutami was required to repay a net amount of $1,327,551.23 on May 8, 2026.

214.    Scale's breaches of the parties' various agreements, including refusing to pay the SUP Payment and withholding NTP and COD payments, have materially disrupted and frustrated Gutami's ability to repay.

35

215. These payments that Scale has refused to make were part of the integrated transaction structure and were intended to provide the cashflows necessary for Gutami to repay the Credit Agreement.

216. Additionally, Scale has obstructed Gutami's progress in developing multiple projects and prevented Gutami from reaching important milestones. These actions or inactions include rejecting Qualifying Projects, failing to respond to Qualifying Projects, taking over and stalling projects, refusing to progress the Maryland portfolio, refusing to execute CP documents for Three Sisters Projects, refusing to issue powers of attorney required (or take other steps allowing for Gutami on behalf of Scale) to complete certain CPs, refusing to execute easement memoranda of understanding or pay deposits, forcing CESIR re-studies by letting previous CESIRs lapse, and causing substantial and unnecessary interconnection cost increases.

217. Separately, Scale breached Section 2 of the First Amendment to the Credit Agreement, which expressly required the parties to execute a Maryland MIPA within thirty days of March 31, 2025 — by April 30, 2025. Scale's failure to do so was an independent breach of the Credit Agreement itself. Scale cannot seek to enforce or accelerate repayment of a Credit Agreement while it has breached a provision of that same agreement.

218. Defendants now rely on the very obstacles they have created to accuse Gutami of non-performance in order to withhold payments due to Gutami. By withholding these payments and obstructing progress, Scale directly deprived Gutami of the funds required to satisfy Gutami's repayment obligations.

219. Given these breaches and Scale's conduct, Scale cannot enforce a maturity date it manufactured (May 8, 2026) by preventing the project milestones that were the contractual basis for determining and satisfying repayment obligations.

220.    Scale cannot enforce or accelerate repayment of the Credit Agreement balance while: (i) its own material breaches caused Gutami's inability to generate repayment funds; (ii) it improperly added $1M to the balance that should have been a direct payment to Gutami; and (iii) Gutami's damages against Scale substantially exceed the net Credit Agreement balance.

221.    An actual, present, substantial, and justiciable controversy exists between and among Gutami, Scale, and SMS DevFin about whether Gutami currently must make payments under the Credit Agreement.

222.    By reason of the foregoing, Gutami is entitled to a declaratory judgment stating: (1) the Credit Agreement is not currently subject to acceleration or immediate repayment given Scale's material breaches; (2) the $1M SUP loan addition is improper and must be removed from the balance; (3) Scale cannot rely on conditions it caused to fail to declare an Event of Default; and (4) Gutami's damages against Scale entitle it to recoupment or setoff exceeding any net balance.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (Declaratory Judgment against Scale – No Shortfall Claims under MIPA 1 or 2)

223.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

224.    There is a substantial controversy between Gutami and Scale as Scale claims and Gutami denies that there is a shortfall of electricity (provided from Qualifying Projects) that permits Scale to offset amounts it owes to Gutami or to claim it is owed money from the shortfall.

225.    This claim for offset arises under section 6.4 of MIPA 1 and MIPA 2.

37

226.    Both parties have adverse legal interests in determining whether Scale may offset amounts it owes to Gutami, including NTP and COD milestone payments, against alleged shortfall claims.

227.    As Scale has used an alleged right to "offset" amounts due to Gutami as a reason to withhold past-due payments under the parties' agreements, the controversy is real and immediate and warrants declaratory judgment.

228.    Scale has hindered and obstructed Gutami's ability to deliver 100 MW under both MIPA 1 and MIPA 2. Any alleged shortfalls under MIPA 1 or MIPA 2 are directly attributable to Scale's own conduct, including rejecting Qualifying Projects without contractual basis, failing to respond to project submissions within a commercially reasonable time, abandoning the Maryland portfolio after eleven months of negotiation, and systematically obstructing project progression. A party may not manufacture a shortfall through its own conduct and then invoke that shortfall to withhold payments or assert offset rights against the other party.

229.    As to the Maryland portfolio specifically, Scale's refusal to execute the Maryland MIPA—in breach of the First Amendment to the Credit Agreement, which required MIPA execution by April 30, 2025—directly destroyed the commercial framework through which approximately 40 MWp of Maryland Qualifying Projects could have been delivered under MIPA 2, causing the very shortfall Scale now asserts. A party cannot manufacture a shortfall by breaching its own obligation to create the commercial framework within which projects were to be delivered, and then invoke that shortfall against the other party.

230.    Gutami is entitled to a declaration that: (1) any alleged shortfalls under MIPA 1 or MIPA 2 are the fault of and/or caused by Scale; (2) Scale is not owed anything for

38

claimed shortfalls under MIPA 1 or 2; and (3) Scale is not entitled to an offset for such claimed shortfalls.

## AS AND FOR THE EIGHTH CAUSE OF ACTION

**(Declaratory Judgment against Scale – No Liquidated Damages under Option Agreement)**

231. Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

232. Scale claims that Gutami violated the Option Agreement's exclusivity requirements by offering the Maryland portfolio and River Run project to third parties.

233. As a result, Scale has claimed that Gutami owes Scale $1,000,000 in liquidated damages.

234. Both parties have adverse legal interests in determining whether Gutami must pay the liquidated damages, and Scale's claim creates a real and immediate controversy warranting declaratory judgment.

235. Scale is not entitled to liquidated damages for the River Run project because it was not covered by the Option Agreement. It is covered by MIPA 2.

236. Even if the River Run project were covered by the Option Agreement, the Option Agreement's project-level process was never activated for River Run, meaning no exclusivity mechanism was ever engaged and no breach of exclusivity is possible. But even if the process had been activated, Scale's refusal to formally accept or reject projects constitutes an effective rejection under the ROFO process, triggering Gutami's right to market to third parties. In such a case, Gutami satisfied the Agreement's exclusivity requirements by presenting the project to Scale, which rejected it, offering the project to third parties only after Scale rejected it.

237. Scale is not entitled to liquidated damages for the Maryland portfolio because the Option Agreement's exclusivity provisions are structurally inoperable as to the

39

Maryland portfolio. The Option Agreement supplements a functioning MIPA framework and cannot operate as a standalone mechanism in the absence of one. Without a Maryland MIPA establishing the commercial foundation for project-level transactions—purchase price, conditions precedent, closing mechanics—the Option Agreement's project-by-project processes cannot be activated or enforced against Gutami for Maryland projects. Scale's abandonment of the Maryland MIPA destroyed the prerequisite commercial framework before any Option Agreement process could be triggered. Scale cannot invoke an exclusivity mechanism it rendered inoperable through its own commercial-level rejection.

238.    Moreover, under the prevention doctrine, Scale cannot rely on the non-occurrence of conditions that it itself caused to fail. The Maryland MIPA was the structural prerequisite for the Option Agreement to govern Maryland projects. Scale's refusal to execute the Maryland MIPA prevented that prerequisite from being satisfied. Having caused the inoperability of the Option Agreement's Maryland mechanisms, Scale is barred from asserting that Gutami violated those mechanisms by seeking alternative buyers.

239.    Scale may contend that the First Amendment to the Credit Agreement brought Maryland within the Option Agreement's geographic scope, thereby preserving its exclusivity claim. This argument fails. The First Amendment expanded the Option Agreement's territorial reach; it did not—and could not—supply the MIPA that is structurally necessary for the Option Agreement's project-level mechanisms to function for Maryland. Moreover, Scale's abandonment of the Maryland MIPA occurred after the First Amendment to the Credit Agreement was executed. Scale cannot expand the Option Agreement's scope via the First Amendment and then destroy the commercial foundation that makes that scope operative by refusing to execute the MIPA.

40

240.    Even apart from the structural inoperability argument, and independent of it, no Option Agreement process was ever activated for the Maryland portfolio. No project companies were formed, no agreements were assigned to project companies, no Proposed Project Summaries were delivered, no non-binding acceptances were issued, and no right of first offer or right of first refusal periods were ever triggered. The conditions precedent to any exclusivity under the Option Agreement were never met.

241.    Even if the Option Agreement applied and the process had been activated, Scale affirmatively directed Gutami to market it to third parties. Scale's Vice President, Tom Wheeler, directed Gutami to eight specifically identified alternative buyers. Scale's instruction to market the Maryland portfolio to identified third parties is wholly inconsistent with any continuing exclusivity claim and independently triggered the Option Agreement provision for Scale's notice that it no longer intends to pursue the proposed acquisition of those projects, terminating any exclusivity that might otherwise have applied. Gutami relied on Scale's direction and proceeded accordingly. Alternatively, and at minimum, Scale's instruction to market the portfolio to third parties constituted: (a) a project-level declination triggering the ROFO fallback for Maryland specifically, and (b) an estoppel preventing Scale from claiming liquidated damages or a Turned Down Payment for transactions Scale itself directed Gutami to pursue.

242.    Additionally, under New York law, liquidated damages clauses are unenforceable where they operate as a penalty rather than a genuine pre-estimate of actual loss. Here, Scale suffered no cognizable loss from any alleged breach, and the $1,000,000 in damages is far afield from any fair estimate of the loss.

243.    Scale's actions also prevented the occurrence of conditions precedent, and Scale now relies on these non-occurrences to avoid its own obligations and impose liability on

Gutami. Such actions also violate the prevention doctrine and Scale's obligation to act in good faith and fair dealing.

244. Scale also has threatened to assess a 37.5% Turned Down Payment if River Run were sold to another developer. Scale is not entitled to any such payment even in the event of such a sale. Again, River Run is governed by MIPA 2 and the Option Agreement's project-level process was never activated for it. But even if River Run were within the Option Agreement's scope, Scale's assertion of continuing exclusivity while simultaneously refusing to evaluate or fund the project, combined with its failure to formally accept or reject it, prevented the project from reaching the stage where a Turned Down Payment could properly be calculated or owed. Scale cannot invoke a payment mechanism that its own conduct prevented from being properly completed.

245. By reason of the foregoing, Gutami is entitled to a declaratory judgment that: (1) the Maryland portfolio is not subject to the Option Agreement; (2) the River Run project is not subject to the Option Agreement; (3) alternatively, even if the Maryland portfolio and/or the River Run project were subject to the Option Agreement, Gutami satisfied the Option Agreement's exclusivity requirements by presenting the projects to Scale and offering the projects to third parties only after Scale rejected them; (4) Gutami did not breach any exclusivity obligations in the Option Agreement; (5) Scale is not entitled to $1,000,000 in liquidated damages as a result of a breach of the exclusivity obligations; and (6) Scale is not entitled to a 37.5% Turned Down Payment if River Run is sold to another developer.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Scale)

246. Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

247.    Scale's conduct, including but not limited to its refusal to evaluate, pursue, or purchase projects it claims are covered by the Option Agreement and its exclusivity while simultaneously attempting to prevent Gutami from finding other investors for those projects, has directly caused Gutami to lose the value of more than 75 MWdc of those projects. Under New York law, these losses constitute direct damages recoverable by Gutami.

248.    Under the Option Agreement, Gutami granted certain exclusivity rights to Scale "in respect to projects being developed by Gutami for eventual acquisition by Scale." Thus, it was reasonably expected by the parties to the Option Agreement that Scale would evaluate and either pursue and/or purchase the projects covered by the agreement, or decline them—and not indefinitely refuse to take either action and instead attempt to prevent Gutami from selling the projects to third parties.

249.    The Busti project and Gutami's New York portfolio are within the Option Agreement's scope. And to the extent the Court finds the Option Agreement is also applicable to the Maryland portfolio (which Gutami denies), and to the extent Scale's conduct described herein does not constitute breach of any express term of the applicable agreements, such conduct constitutes a breach of the implied covenant of good faith and fair dealing.

250.    Scale abandoned the execution of the Maryland MIPA for the Maryland projects, demonstrating its intention to not acquire or proceed with the Maryland portfolio.

251.    Scale also instructed Gutami to market the Maryland portfolio to third parties and then, after the fact, claimed that Gutami breached the Option Agreement in doing so and demanded new exclusivity over it.

252.    Scale's commercial-level rejection of Maryland at the MIPA level was itself an effective rejection under the Option Agreement. Scale cannot invoke the exclusivity

43

provisions of an agreement whose operative prerequisites it destroyed and cannot claim that Gutami violated a mechanism that Scale's own conduct rendered inoperable.

253.    But even if Scale had not rejected the Maryland portfolio at the MIPA level, the Option Agreement's project-level exclusivity and "ROFO" mechanisms were never activated for any specific Maryland project company. No Proposed Project Summaries were submitted, no non-binding acceptances were issued, and Scale never triggered the formal process. Yet Scale is holding Gutami to exclusivity under the Agreement's scope while refusing to either activate the project-level process or release the projects.

254.    The Option Agreement includes Gutami's Busti project.

255.    Gutami (with a co-developer) submitted a Proposed Project Summary for the Busti project.

256.    Scale conducted full diligence on the Busti project (thereby activating the process).

257.    Scale declined the Busti project without providing the written rejection notice that would have enabled Gutami to market Busti to third parties.

258.    In declining to proceed with the Busti project, Scale did not identify any contractual deficiency under MIPA 1, the Loan Agreement, or the Option Agreement. Instead, Scale warned Gutami to "keep well away from" the Busti project (or words to that effect), implying the existence of an undisclosed issue unrelated to contractual criteria.

259.    In rejecting the Busti project, Scale cited organizational complexity as its stated reason. Not only was this not a valid contractual reason for rejection, but it also was pretextual. Scale's rejection was instead based on its broader goal of extricating itself from community solar projects—including ones already subject to binding agreements—that had

44

become economically disadvantageous. Scale's intent is supported by its non-formal rejections of Busti, the New York 30 MW portfolio, Maryland, and River Run.

260.    By declining the Busti project without issuing the formal rejection notice and then nonetheless asserting continued exclusivity over it, Scale left the Busti project in a limbo where Gutami could neither have it acquired by Scale nor market it to third parties.

261.    The Option Agreement includes Gutami's New York portfolio projects.

262.    Gutami submitted the New York portfolio to Scale after it was offered to Gutami by a third-party developer. Gutami repeatedly tried to get Scale to either confirm acceptance or rejection of the portfolio before it was no longer available from the third-party developer. Scale did not respond for six weeks and only then asked basic questions that could have been raised immediately. Scale did not engage until the portfolio was no longer available, having failed to respond within a commercially reasonable timeframe.

263.    Scale's failure to provide a response to the New York portfolio in a reasonable amount of time was intended to deprive Gutami of the benefits of the portfolio projects.

264.    Although Gutami maintains that River Run does not come under the Option Agreement (and even if it could, Scale never followed the procedure to do so), Scale has attempted to utilize the exclusivity rights under the Option Agreement on River Run as well to prevent Gutami from selling it, further demonstrating its intentions.

265.    Gutami recently provided Scale with full access to River Run data and information, but Scale did not review any of the materials or ask any questions, and Scale did not engage in any way with the River Run project, confirming Scale had no intention of progressing with River Run either.

266.     Scale's treatment of the Maryland portfolio of projects, the Busti project, the New York portfolio of projects, and the River Run project demonstrates that Scale has no interest in actually progressing, acquiring, or pursuing these projects. Instead, Scale is weaponizing the Option Agreement by using a contractual right (the exclusivity option) in a manner specifically designed to trap Gutami with no ability to benefit from the agreement in any direction.

267.     Gutami is unable to reap the benefits of the Option Agreement, either to provide additional qualifying projects to Scale to make up for any purported shortfall (falsely created by Scale) or to enjoy the benefits of its investment with a sale of the projects.

268.     Scale's conduct demonstrates its intention to evade the spirit of its bargain with Gutami rather than performing under the Option Agreement. And it is part of an overall pattern of conduct and scheme by Scale designed to evade agreements instead of performing under them, essentially causing cross-agreement sabotage.

269.     Although the Option Agreement provides Scale with sole discretion regarding whether or not to issue a Project Acceptance Notice, this is not a case of Scale merely declining to exercise its option; it is a case of Scale using the sole discretion and option in bad faith to render Gutami unable to benefit from the agreement in any direction. Such conduct falls squarely outside the protection of such a discretion clause. A party cannot exercise discretion in a way that frustrates another party's rights under the contract.

270.     Gutami seeks relief from the trap that Scale has created, not a voiding of its exclusivity obligations. Gutami seeks a finding that Scale's conduct violates the implied covenant and excuses Gutami from those exclusivity obligations (to the extent they apply to

46

those projects) with respect to the specific projects Scale has refused to evaluate, formally accept, or release through the proper formal rejection process.

271.    Scale's refusal to progress, acquire, or admit that it has declined these projects while asserting exclusivity over them has caused Gutami to lose the ability to monetize the New York portfolio (30 MW), Busti (6.5 MWp), and the Maryland portfolio (39.7 MWdc) and caused these projects to lose value.

272.    Under New York law, where a counterparty's breach deprives the performing party of the benefit of the bargain, the lost value of the underlying asset is recoverable as direct damages.

273.    These damages are distinct from and in addition to any declaratory relief sought in the Seventh Cause of Action.

274.    For Scale's breach, Gutami's direct damages from lost project value are as follows: (a) NY 30 MW portfolio — $3,000,000; (b) Busti — $620,000; and (c) Maryland portfolio — $11,910,000. The total of these direct damages is $15,530,000, plus prejudgment interest. Such damages are a direct, proximate, and immediate result of Scale's breaches and conduct.

275.    Scale also has caused, or is about to cause, Gutami to suffer reliance damages, including costs for interconnection studies, engineering, permitting, legal fees, site control, and diligence costs, of at least approximately $2 million for the Maryland portfolio of projects. Such damages are a direct, proximate, and immediate result of Scale's breaches and conduct.

276.    Gutami is entitled to a judgment against Defendants in an amount no less than $17,530,000.00, to be determined at trial, plus interest, costs, disbursements, and attorney's fees.

## AS AND FOR THE TENTH CAUSE OF ACTION

**(Breach of MIPA 2 and the Credit Agreement against Defendants — Failure to Cooperate and Take Action Necessary to Complete the Transaction on River Run)**

277.    Gutami repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

278.    The River Run project is part of and governed by MIPA 2.

279.    Under MIPA 2, Scale is obligated to cooperate and use commercially reasonable efforts to act in a way "to consummate the transactions contemplated by [the MIPAs] as promptly as practicable." *See* § 6.3(a). Scale is likewise obligated to "use commercially reasonable efforts to take, or to cause to be taken, all action and to do, or to cause to be done, all things necessary, proper or advisable to complete, as promptly as practicable, the transactions contemplated herein…" *See* § 3.4.

280.    For River Run, Gutami satisfied every condition Scale claimed was required — clean title, DEC approval, executed interconnection agreement, confirmed NYSERDA incentives, all municipal approvals, engineering, and permitting. Despite receiving a fully de-risked, NTP-ready project, Scale made no proposal, refused to progress, failed to review any River Run materials when provided full data access, and declined to support the final interconnection payment, preventing delivery of the 4.7 MWp project.

281.    As evidence of bad faith, Scale simultaneously asserted exclusivity, threatened the 37.5% Turned Down Payment, and required re-offering to Scale — having the

practical effect of rendering River Run commercially non-viable and placing at least approximately $1M in sunk development costs at risk.

282.    Scale's conduct violated Sections 6.3(a) and 3.4 of MIPA 2.

283.    Under New York law, where a counterparty's breach deprives the performing party of the benefit of the bargain, the lost value of the underlying asset is recoverable as direct damages.

284.    Separately, Scale's conduct under the Credit Agreement — engaging in the Identification and Acceptance of Projects process (per Section 1.10) for River Run, inducing continued performance by Gutami, and then refusing further steps within its sole control (such as funding, scheduling, and progression to closing)— independently prevented River Run from reaching Approved Project status, triggering the prevention doctrine under the Credit Agreement as well as under MIPA 2.

285.    For Scale's breaches, Gutami's direct damages from lost project value for River Run are at least approximately $940,000. Such damages are a direct, proximate, and immediate result of Scale's breaches and conduct.

286.    Scale also has caused, or is about to cause, Gutami to suffer reliance damages, including interconnection studies, engineering, permitting, legal fees, site control, and diligence costs, of at least approximately $1 million for River Run. Such damages are a direct, proximate, and immediate result of Scale's breaches and conduct.

287.    Gutami is entitled to a judgment against Defendants in an amount no less than $1.94 million, to be determined at trial, plus interest, costs, disbursements, and attorney's fees.

## PRAYER FOR RELIEF

49

**WHEREFORE**, Gutami requests judgment against Defendants as follows:

A.  On the First Cause of Action, a money judgment against Scale in amount no less than $7,195,610.67, plus interest, costs, disbursements, and attorneys' fees.

B.  On the Second Cause of Action, a money judgment against Scale in amount no less than $4,716,444.83, plus interest, costs, disbursements, and attorney's fees.

C.  On the Third Cause of Action, a money judgment against Scale for at least $1,000,000, plus Gutami's interest burden for the "loaned" amount, or (alternatively) a judgment recharacterizing the $1M Credit Agreement loan as an outright payment already owed (effectively reducing the Credit Agreement balance by $1M) and awarding the interest that has accrued on that $1M balance from the date it should have been paid as a direct SUP payment, costs, disbursements, and attorney's fees.

D.  On the Fourth Cause of Action, a money judgment against Scale for at least $1,400,000, plus interest, costs, disbursements, and attorney's fees.

E.  On the Fifth Cause of Action, a declaratory judgment against Scale declaring that Gutami is not obligated to indemnify Scale $6,484,826 or any other amount in connection with the Payne Projects for any reason under MIPA 1 or the Payne Closing Agreement.

F.  On the Sixth Cause of Action, a declaratory judgment against Scale and SMS DevFin declaring that: (1) the Credit Agreement is not currently subject to acceleration or immediate repayment given Scale's material breaches; (2) the $1M SUP loan addition is improper and must be removed from the balance; (3) Scale cannot rely on conditions it caused to fail to declare an Event of Default; and (4) Gutami's damages against Scale entitle it to recoupment or setoff exceeding any net balance.

G. On the Seventh Cause of Action, a declaratory judgment against Scale declaring that:

(1) any shortfalls under MIPA 1 or MIPA 2 are the fault of Scale; (2) Scale is not

owed anything for claimed shortfalls under MIPA 1 or 2; and (3) Scale is not entitled

to an offset for such claimed shortfalls.

H. On the Eighth Cause of Action, a declaratory judgment against Scale declaring that:

(1) the Maryland portfolio is not subject to the Option Agreement; (2) the River Run

project is not subject to the Option Agreement; (3) alternatively, even if the Maryland

portfolio and/or the River Run project were subject to the Option Agreement, Scale's

commercial-level rejection of the Maryland MIPA constituted an effective rejection

of the Maryland portfolio under the Option Agreement, releasing Gutami from any

exclusivity obligations with respect to it; (4) alternatively, even if the Maryland

portfolio and/or the River Run project were subject to the Option Agreement, Gutami

satisfied the Option Agreement's exclusivity requirements by presenting the projects

to Scale and offering the projects to third parties only after Scale rejected them; (5)

Gutami did not breach any exclusivity obligations in the Option Agreement; (6) Scale

is not entitled to $1,000,000 in liquidated damages as a result of a breach of the

exclusivity obligations; and (6) Scale is not entitled to a 37.5% Turned Down

Payment if River Run is sold to another developer.

I. On the Ninth Cause of Action, a money judgment against Scale in amount no less

than $17,530,000.00, to be determined at trial, plus interest, costs, disbursements, and

attorney's fees;

51

J.   On the Tenth Cause of Action, a money judgment against Scale in amount no less than $1.94 million, to be determined at trial, plus interest, costs, disbursements, and attorney's fees;

K.   And for such other and further relief as this Court may deem just and proper.

Dated:        New York, New York
              July 6, 2026

                                         **HODGSON RUSS LLP**
                                         *Attorneys for Plaintiffs Gutami Inc., Gutami Energy, LLC (f/k/a CSG-Gutami, LLC), and Gutami Solar, LLC*

                                         By: _____
                                             Aaron M. Saykin, Esq.
                                             William G. Fassuliotis, Esq.
                                         605 Third Ave.
                                         Suite 2300
                                         New York, New York 10158
                                         Telephone:  212.751.4300
                                         asaykin@hodgsonruss.com
                                         wfassuliotis@hodgsonruss.com

69532354v7